# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ERSOL L. HENRY and**
**TERRI J. LEWIS,**

                Plaintiffs,

                **Case No. 04-C-432**

    -vs-

**MILWAUKEE COUNTY,**

                Defendant.

## DECISION AND ORDER

This matter was tried to the Court on March 19-21, 2007. The plaintiffs, Ersol Henry ("Henry") and Terri Lewis ("Lewis"), worked as Juvenile Correction Officers ("JCOs") at Milwaukee County's Juvenile Detention Center ("JDC"). Henry and Lewis allege that they were denied overtime assignments on third shift at the JDC because of their gender in violation of Title VII. Henry and Lewis also allege that they were subjected to a variety of other indignities (*cf.* "adverse employment actions") in the workplace on account of their gender. Finally, Henry and Lewis allege that they were retaliated against for filing complaints of discrimination.

The Court finds that: (1) plaintiffs were not affected in the terms and conditions of their employment; (2) plaintiffs were not subject to discrimination on account of their gender or in retaliation for filing discrimination complaints; and (3) gender was a Bona Fide Occupational Qualification ("BFOQ") for JCOs working third shift at the JDC.

Therefore, the plaintiffs are not entitled to relief and this matter is dismissed.

## FINDINGS OF FACT

Milwaukee County operates the JDC for the care, safety, security and rehabilitation of juvenile detainees entrusted to its care. The living areas of the JDC are organized into living units called "pods" which contain individual cells. Pods at the JDC can accommodate from 11 to 22 juveniles. The pods are segregated by gender so that the living areas of boys and girls are separated.

Each pod is separated by a series of security doors. Each cell contains a bed, a toilet, a desk, and a small storage area. All of the areas in each cell are visible from the outside of the cell through a window in the cell door. The cell doors are constructed in a way that allows the cell occupant to communicate through the door. Although the juveniles sleep in individual cells, they spend the majority of their daytime hours in a common room, classroom, or recreation room.

It is only on third shift (from the hours of 11:00 p.m. to 7:00 a.m.) that the juveniles are confined to their individual cells. On third shift, the JCOs are required to view each inmate at 15 and 30 minute intervals. There are no co-educational pods at the JDC.

In February 1997, Milwaukee County implemented a new policy where it would not allow women to work on third shift male pods. The change coincided with the JDC moving into a new detention facility. For many years prior to February 1997, women, including the plaintiffs, were allowed to work numerous hours of voluntary overtime on third-shift male pods. This occurred even if the woman was the only JCO assigned to that pod.

Most of the available overtime was on male pods because the facility contains many more male pods than female pods. Third shift overtime was more available than overtime on other shifts. Unlike the other two shifts, third shift overtime offered premium pay. After February 1997, plaintiffs were unable to work as much overtime as they previously worked.

The JDC is required by both Wisconsin statute and regulation and its own mission statement and policies, to provide for the care and rehabilitation of juveniles in its custody. B. Thomas Wanta was appointed superintendent of the JDC in 1991. Superintendent Wanta is an experienced juvenile correctional institution administrator. Wanta adapted the theory of same-gender role modeling/mentoring programs for use at the JDC for the same reasons that such programs are used in other settings – to improve the chances that juveniles will not relapse into a pattern of delinquent behavior.

Wanta also changed the supervision model used by staff members at the JDC to facilitate and further advance the benefits of a role-modeling/mentoring program. Previously, staff members followed an "indirect supervision" model where staff members observed juveniles from a distance without significant interaction. Wanta initiated a "direct supervision" model that brings staff members into close, direct contact with juveniles and facilitates role modeling/mentoring. Wanta's decision to employ the direct supervision model was based on his consultations with experts and colleagues and his review of the literature in the field of juvenile justice and detention and role modeling/mentoring.

It is generally accepted in the juvenile corrections field that juveniles require care and attention in excess of that provided to adults. An important consideration in caring for the

-3-

juveniles entrusted to the care and custody of the JDC is to do no further harm (including sexual exploitation) to a population of children and juveniles who are already at risk for future delinquent or criminal behavior.

Same gender role modeling furthers the twin goals of rehabilitation and security in the juvenile detention setting. Research demonstrates that juveniles participating in same-gender role model/mentoring programs are significantly less likely to engage in anti-social activities or truancy. Research also demonstrates academic improvements and strengthening of family and peer relationships.

Accordingly, based on his education, experience, and independent research, Superintendent Wanta concluded and made a professional judgment that same-gender role modeling/mentoring at the JDC would have significant positive benefits for the children and juveniles detained at the Milwaukee County JDC. Wanta also concluded that this program would help him meet his statutory and regulatory obligations to engage in the care and rehabilitation of children and juveniles entrusted to the custody of the JDC.

Superintendent Wanta reasoned that in order to maintain a consistent program, same-gender role modeling/mentoring should be used on all three shifts, including overtime assignments, at the JDC. Therefore, he required that at least one same-gender JCO serve as pod supervisor on first and second shift. Since there is only one staff member on third shift, that staff member would be required to be the same gender as the juveniles on the pod that the staff member supervised. Accordingly, Wanta developed a shift assignment policy that assigned same-gender staff members to certain posts – including each of the pods at the JDC

-4-

on each of the three shifts. Thus, when a regularly assigned same-gender staff member on third shift was absent, the administration would make every effort to fill that specific post by another same-gender staff member.

Same-gender shift assignments serve to protect the privacy interests of the juvenile detainees. On third shift, staff members have the opportunity to observe juveniles sleeping, toileting, acting out, engaging in sexual activity, or in various states of undress. Many of the JCOs who testified at trial indicated that they observed one or more of these activities during the course of their employment on third shift. Superintendent Wanta believes that nighttime observation by opposite-gender staff and other intrusions into privacy interferes with the juvenile rehabilitation process.

Same-gender shift assignments also serve the goals of risk management and security. Even though there is a security system in place at the JDC, staff members serve in geographically isolated cells/pods and may gain access to an individual juvenile cell by evading the existing security system. Actual as well as alleged heterosexual assaults and misconduct are statistically more likely than homosexual attacks. It is, therefore, inefficient from a risk management perspective to assign a staff member to an opposite gender living area on third shift. The alternative to protecting against this risk with same-gender staffing on third shift is to hire an additional staff member for each pod on third shift at an approximate cost of $750,000 per year.

Because the juveniles are normally sleeping and confined to their cells during third shift, there is less opportunity for role modeling than during the other shifts. Nonetheless, the opportunity for counseling arises from time to time even during third shift.

The plaintiffs filed EEOC complaints in May 1996 and October 1997 regarding harassment and discrimination in the workplace. On January 26, 1997, the plaintiffs were grievants regarding the gender-specific overtime assignments. Plaintiffs eventually transferred to jobs in different departments. The new jobs had a higher hourly rate of pay, but their overall income was less because of the loss of overtime.

After Henry and Lewis switched jobs, Milwaukee County abandoned same-gender JCO assignments for third shift.

## ANALYSIS

**I.     Adverse Employment Action – Retaliation – Harassment**

In order for an adverse employment action to be actionable under Title VII, it must "materially alter the terms and conditions of . . . employment." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005). While an adverse employment action is defined quite broadly, not everything that makes an employee unhappy suffices. *See Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002). If every minor change in working conditions or trivial action were a materially adverse action, then any "action that an irritable, chip-on-the shoulder employee did not like would form the basis of a discrimination suit." *Williams v. Bristol-Meyer Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996). "Workplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that

-6-

act or omission to the level of a materially adverse action." *Blackie v. State of Maine*, 75 F.3d 716, 725 (1st Cir. 1996).

Plaintiffs make a large number of complaints about "discrimination" and "harassment," none of which affected the terms and conditions of their employment.

For example, plaintiffs, who are friends, testified that they were not allowed to work together on the same shift. Plaintiffs have no federal right to work shift assignments in the company of friends. Plaintiffs testified that they were not assigned to work on the smaller pods or to "support positions," perceived as easier job assignments than being assigned to larger pods. There is no evidence suggesting that working on larger pods was so difficult or unpleasant that the terms and conditions of plaintiffs' employment were affected. Plaintiffs also complained that their time cards were periodically missing without explanation and that they were called regarding overtime very early in the morning on their vacation days. These trivial inconveniences simply do not rise to the level of an adverse employment action.

The inquiry with respect to plaintiffs' retaliation claims is slightly different. While the discriminatory acts proscribed by Title VII's anti-retaliation provision "are not limited to those that affect the terms and conditions of one's employment . . . . the employer's challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in protected activity." *Roney v. Illinois Dept. of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, — U.S. —, 126 S.Ct. 2405, 2412-13, 2415 (2006)).

-7-

To put it mildly, Henry and Lewis found fault with numerous actions undertaken by management with respect to their employment. The Court finds that the vast majority of these actions (*e.g.* criticism for wearing a sweater to work, timecard written on with red ink, criticism for eating a sandwich at work) are not "materially adverse" such that a reasonable employee would be "dissuaded from engaging in protected activity."

Plaintiffs also argue that they were harassed because of their protected activities. In addition to the complaints noted above, Henry testified that she was periodically "intimidated" by head of shift Bobby Bell ("Bell"). Bell told Henry on more than one occasion that he was going to "get her" or "take care of her." Also, Deputy Superintendent Mavis McCallum ("McCallum") slammed a door in Henry's face when she arrived late for a grievance meeting. None of these actions, taken separately or in combination, meet the objective standard set forth in *Burlington*. The anti-retaliation provision prohibits employer actions that are "likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers. And normally *petty slights, minor annoyances, and simple lack of good manners will not create such deterrence*." *Burlington*, 126 S. Ct. at 2415 (emphasis added).

Of course, the main thrust of plaintiffs' case is the denial of overtime assignments. Prior to the gender-specific overtime assignment policy on third shift, plaintiffs garnered a great deal of overtime. Subsequently, plaintiffs did not work as much overtime. However, plaintiffs were not denied the ability to work overtime assignments on other shifts, but expressed a preference for working overtime on third shift because it was a better fit for their

personal schedules. Also, plaintiffs (and others) testified that working on third shift was easier because the juveniles were generally asleep, and there wasn't much to do but sit around.

Furthermore, the gender-specific overtime policy for third shift was enacted pursuant to the management rights clause of the collective bargaining agreement. Accordingly, Milwaukee County had the discretion to distribute overtime assignments in a manner of their own choosing. The denial of a "monetary perk . . . does not constitute an adverse employment action if it is *wholly within the employer's discretion to grant or deny and is not a component of the employee's salary*." *Tyler v. Ispat Inland, Inc.*, 245 F.3d 969, 972 (7th Cir. 2001) (emphasis added); *see also Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004) (employer's denial of overtime pay is not an adverse employment action). Therefore, the denial of overtime on third shift was not an adverse employment action.

## II. Causation

Plaintiffs failed to demonstrate that they were discriminated against because of their gender or in retaliation for their complaints of discrimination. There is absolutely no evidence which suggests that any of the alleged "adverse employment actions" were visited upon plaintiffs because of their gender.[1]

---

[1] The denial of third shift overtime is the exception, but as noted above (section I), this denial does not rise to the level of an adverse employment action. Further, as discussed below (section III), gender is a Bona Fide Occupational Qualification ("BFOQ") for third shift guard duty at the JDC.

-9-

As for retaliation, plaintiffs argue that they were treated differently and were subject to a campaign of harassment only after they filed complaints of discrimination. This is not enough to establish, as a matter of law, that plaintiffs were harassed or retaliated against because of their protected activity. "The mere fact that one event preceded another does nothing to prove that the first event caused the second." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000); *see also Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998) ("Timing may be an important clue to causation, but it doesn't eliminate the need to show causation").

Plaintiffs' only evidence of a causal link is that they were referred to as "trouble makers" by members of management. Given that plaintiffs were constantly lodging harassment complaints, filing memos, and generally complaining whenever any of their superiors attempted to correct their behavior, it is not surprising that they earned this moniker. The use of the phrase "trouble makers" in this context does not refer to any of plaintiffs' protected activities. Moreover, there is no evidence that plaintiffs were referred to as "troublemakers" in the context of an adverse employment action or that the reference dissuaded plaintiffs from "engaging in future protected activity."

### III. Bona Fide Occupational Qualification ("BFOQ")

In *Leggett v. Milwaukee County*, Case No. 04-C-422 (E.D. Wis. 2006), the Court considered the same evidence presented by Milwaukee County at trial with respect to Bona Fide Occupational Qualification. The Court held that "male gender is a BFOQ for JCOs working third shift in male pods at the [JDC] [sic]." (*Id.*, Docket No. 26, p. 5). The Court

-10-

decided *Leggett* in the context of an unopposed motion for summary judgment. The evidence and arguments presented by the plaintiffs in this case does not change the Court's view that gender is a BFOQ for third shift male pod assignments at the JDC.

Title VII permits classifications based on gender where sex is a BFOQ "reasonably necessary to the normal operation of that particular business enterprise." *Torres v. Wisconsin Dept. of Health & Social Servs.*, 859 F.2d 1523, 1527 (7th Cir. 1988). To establish a BFOQ, the JDC must show that the essence of its business would be undermined without the gender-based qualification. *Torres*, 859 F.2d at 1531-32.

The essence of the JDC's business is to ensure and promote the care, rehabilitation, safety and security of the juveniles entrusted to its care. Superintendent Wanta concluded that same-gender role modeling/mentoring promoted these goals, whereas cross-gender role modeling/mentoring undermined them. He did so based upon his research and pursuant to his expert professional opinion. More specifically, he concluded that consistency among all of the shifts would reinforce the benefits of the program. To the contrary, inconsistency would cause confusion and uncertainty amongst the juveniles, thereby reducing the positive impact across all of the shifts. Superintendent Wanta's conclusion is entitled to substantial weight and the Court finds it persuasive in this context. *See Torres*, 859 F.3d at 1532 (exercise of professional judgment is entitled to substantial weight); *see also Everson v. Michigan Dep't of Corr.*, 391 F.3d 737, 750 (6th Cir. 2004) ("reasoned decisions of prison officials are entitled to deference").

-11-

Moreover, as noted in *Leggett*, numerous courts have held that the goals of "security, safety, privacy, and rehabilitation can justify gender-based assignments in" correctional facilities. *See, e.g., Everson*, 391 F.3d at 753 ("the exclusion of males from these positions is 'reasonably necessary' to the 'normal operations' of the [Department of Corrections'] female facilities"); *Ribono v. Iranon*, 145 F.3d 1109, 1110-11 (9th Cir. 1998); *Tharp v. Iowa Dep't of Corr.*, 68 F.3d 223, 226 (8th Cir. 1995); *Torres*, 859 F.2d at 1532.

Plaintiffs argue that rehabilitation is not a legitimate goal for the JDC because it is a "detention center" with an average stay of only a few weeks. While it is true that the likelihood of full "rehabilitation" is minimal if the stay is short, this is not to say that efforts to rehabilitate the juveniles, for whatever time they are entrusted to the JDC's care, would be minimal or fruitless. Wanta and several JCOs testified about juveniles whose lives were impacted in a positive way during their stay at the JDC.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. This matter is **DISMISSED** with prejudice; and

2. Judgment shall be entered in favor of the defendant Milwaukee County.

Dated at Milwaukee, Wisconsin, this 31st day of May, 2007.

        **SO ORDERED,**

        **s/ Rudolph T. Randa**
        **HON. RUDOLPH T. RANDA**
        **Chief Judge**